## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| MARCIA O'NEAL and DAVID SIU, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>  vs.<br><br>JOSEPH FINANCIAL, INC., a California corporation; JOSEPH FINANCIAL INVESTMENT ADVISORS, LLC, a California limited liability company; and ROBERT JOSEPH ARMIJO, a California individual,<br><br>      Defendants. | Case No. _____<br><br>**COMPLAINT: INDIVIDUAL AND CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Marcia O'Neal and David Siu ("Plaintiffs"), on behalf of themselves and those similarly situated, allege the following claims for their complaint against Defendants Joseph Financial, Inc. ("Joseph Inc."), Joseph Financial Investment Advisors, LLC ("Joseph LLC") and Robert Joseph Armijo ("Armijo") (collectively, the "Defendants"). Plaintiffs allege the following on information and belief, except as to those allegations that specifically pertain to Plaintiffs, which are alleged on personal knowledge.

## INTRODUCTION

1.      Plaintiffs bring this class action against Defendants to obtain rescission, damages, and/or other relief available under California law on behalf of themselves and numerous other investors who collectively have lost millions of dollars in a Ponzi scheme orchestrated and perpetrated by Brian Davison ("Davison") and Barry Rybicki ("Rybicki") (collectively, the "EquiAlt Managers") using EquiAlt LLC ("EquiAlt"). Defendants served as part of EquiAlt's

1

network of unlicensed sales agents who offered and sold the unregistered securities issued by EquiAlt (the "EquiAlt Securities") to Plaintiffs and other members of the putative class.

2.      The EquiAlt Managers perpetrated the Ponzi scheme through a series of limited liability companies, including EquiAlt Fund LLC ("Fund 1"); EquiAlt Fund II, LLC ("Fund 2"); EquiAlt Fund III, LLC ("Fund 3"); and EA SIP, LLC ("Fund 4") (collectively, the "EquiAlt Funds" or "Funds"). Despite their lack of required securities licenses, Defendants solicited investors and duped them into investing in the EquiAlt Funds.

3.      Specifically, before being shut down by the Securities Exchange Commission ("SEC") in February 2020, the EquiAlt Managers paid the Defendants *undisclosed* commissions for their assistance in raising some $170 million through the offer and sale of the *unregistered* EquiAlt Securities to Plaintiffs and other investors using various means of advertising and *general solicitations*—all under the guise of a purportedly exempt "private offering" under Rule 506(b) of SEC Regulation D ("Rule 506"). Defendants at all times knew that the offering documents and other solicitation materials they were using to solicit and sign-up investors for the EquiAlt Securities contained misrepresentations and material omissions regarding the non-payment of commissions, rendering the EquiAlt Securities not exempt from registration under Rule 506 despite contrary statements in the offering documents.

4.      Securities sales that do not qualify for the Rule 506 "private offering" exemption are public offerings that cannot be sold without registration under federal law or State Blue Sky laws, including those of California, let alone through unlicensed sales agents. To be exempt from federal registration under Rule 506(b) there may be no general solicitation or advertising to market the securities. In addition, the issuer must take reasonable steps to verify that a purchaser of a security sold in the offering is an accredited investor. Furthermore, if any non-accredited investors

are participating in the offering, the company conducting the offering must give them financial statement information specified in Rule 506.

5.     Defendants did not comply with ***any*** of the foregoing requirements when they offered and sold millions of dollars in EquiAlt Securities. They marketed the EquiAlt Securities through general solicitations (including cold calls and dinner presentations). Defendants furthermore received and accepted sales commissions, which they then either concealed or mischaracterized as "finders' fees" to hide the true nature of the commission payments. Defendants furthermore sold the EquiAlt Securities without making reasonable efforts to verify the offerees' actual status as accredited or non-accredited investors. Defendants supplied none of the non-accredited investors with the requisite EquiAlt financial statements because EquiAlt admittedly did not have any financial statements to give them. Defendants meanwhile received steep 10–14% commissions paid directly from the investors' funds.

6.     Over time, EquiAlt through integrated offerings of the unregistered EquiAlt Securities raised more than $170 million from some 1,100 investors located in various states, including investors residing in Florida, California, Arizona, and Colorado. A large percentage of the EquiAlt investors are elderly and many of them invested much of their life savings in the unregistered EquiAlt Securities.

7.     California Blue Sky laws require registration or qualification prior to the sale of any security unless the securities are expressly exempt from the statutory registration requirements. *See* Cal. Corp. Code § 25110(b). California Blue Sky laws also contain anti-fraud provisions comparable to Section 10(b) of the federal Exchange Act, 15 U.S.C. § 78j(b). *See* Cal. Corp. Code § 25401.

8.     On February 11, 2020, the SEC filed an enforcement action against EquiAlt, the integrated EquiAlt investment funds, and the EquiAlt Managers, seeking injunctive and other relief, styled *SEC v. Davison, et al.*, No. 8:20-cv-00325-MSS-AEP (M.D. Fla.), (the "SEC Action"). A copy of the complaint in the SEC Action is attached as **Exhibit A.** The SEC's complaint charges that the EquiAlt Managers operated EquiAlt as a Ponzi scheme and committed multiple violations of the Federal securities laws:

> The Commission brings this emergency action to halt an ongoing fraud conducted by EquiAlt LLC ("EquiAlt"), a private real estate investment company. Beginning in 2011 to the present, Defendants EquiAlt, Brian Davison ("Davison") and Barry Rybicki ("Rybicki") conducted a Ponzi scheme raising more than $170 million from over 1,100 investors nationwide, many of them elderly, through fraudulent unregistered securities offerings. Defendants promised investors that substantially all of their money would be used to purchase real estate in distressed markets in the United States and their investments would yield generous returns. Instead, EquiAlt, Davison and Rybicki misappropriated millions in investor funds for their own personal use and benefit.

Ex. A ¶ 1.

9.     Three days after the SEC filed the SEC Action, EquiAlt was placed into a liquidating receivership. On May 8, 2020, the EquiAlt Receiver (the "Receiver") filed his first quarterly report, a copy of which is attached as **Exhibit B** (the "Receiver's Report"). The Receiver's Report includes extensive findings regarding the operations of the EquiAlt Ponzi scheme. In particular, the Receiver reported:

> These [EquiAlt] investments were sold without registration with either state or federal regulatory agencies. The offerings were purportedly made pursuant to federal exemptions from registration under the provisions of the Securities Act of 1933 provided in Regulation D. However, none of the first four [EquiAlt] Receivership Funds qualified for a Regulation D exemption or any other exemption from registration. The offerings appear to be one continuous fraudulent offering of unregistered securities. The lack of any exemption was clear to the perpetrators from the language contained in offering documents delivered to investors.

**Ex. B** at ECF 14.

10.     The EquiAlt Securities sold by Defendants are "securities" that were neither registered nor exempt from registration as a "private offering" under federal and state law. 15 U.S.C. § 77b(a)(1); Cal. Corp. Code § 25019.

11.     The Court has already entered a preliminary injunction in the SEC Action finding that the SEC "has demonstrated a substantial likelihood of proving that it will prevail on its Section 5 and Section 10(b) registration claims based on the affirmative evidence developed to date demonstrating fraud, the sale of unregistered securities, and representations to investors that were materially false." A copy of the SEC Action Injunction Order is attached as **Exhibit C**.

12.     In August 2021, the Receiver filed an action against Defendants and other sales agents, seeking to recoup commissions unlawfully paid to them in connection with the offer and sale of EquiAlt Securities, styled *Burton Wiand et al. v. Family Tree Estate Planning, et al.*, No. 8:21-cv-00361-SDM-AAS (M.D. Fla.) ("the Receiver Action"). In response to that complaint, several of the sales agent defendants, including Joseph Inc., Joseph LLC, and Armijo, answered, defaulted, or announced a settlement; however, three defendants moved to dismiss for failure to state a claim. On January 25, 2022, the district court denied the motion to dismiss, concluding that "the amended complaint plausibly alleged that the moving defendants received in bad faith 'commissions' and 'fees' resulting from their promotion of the [EquiAlt Ponzi] scheme and reasonably identifies the payments to the moving defendants." *Id.* at ECF No. 130.

13.     This putative class action is brought on behalf of all investors to whom Defendants sold the unregistered EquiAlt Securities from Defendants' headquarters in California. Alternatively, this action is brought on behalf of Plaintiffs in their individual capacities, for losses suffered through the actions of Defendants.

## PARTIES

### PLAINTIFFS

14.     Plaintiff Marcia O'Neal is an individual who resides and is domiciled in the State of Nevada. Plaintiff O'Neal was sold EquiAlt Securities from California. For jurisdictional purposes, O'Neal is a citizen of Nevada.

15.     Plaintiff David Siu is an individual who resides and is domiciled in San Diego, California. Plaintiff Siu was sold EquiAlt Securities Defendants from California. For jurisdictional purposes, Siu is a citizen of California.

### DEFENDANTS

16.     Defendant Joseph Inc. is a California corporation with a principal place of business in San Diego, California.

17.     Defendant Joseph LLC is a California limited liability company with a principal place of business in San Diego, California.

18.     Defendant Armijo is, and was at all times mentioned herein, a citizen of the State of California, who currently resides in Nevada. Defendant Armijo is the principal owner of Joseph Inc. and Joseph LLC.

### JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA") codified as 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs, and there is minimal diversity.

20.     This Court has personal jurisdiction over Defendants because they marketed and sold EquiAlt's unregistered securities issued from EquiAlt's headquarters in Tampa, Florida. As

such, Defendants have purposefully availed themselves of the laws of the State of Florida and have established minimum contacts with the State of Florida.

21.     The Court also has personal jurisdiction over Defendants because they have voluntarily agreed to submit to this Court's jurisdiction through the submission of a "Proof of Claim" in the SEC Action ("the Proof of Claim"), signed by Robert Armijo, which states:

**IMPORTANT INFORMATION TO READ PRIOR TO SUBMITTING THIS FORM**

Any person or entity submitting this Proof of Claim Form submits to the exclusive jurisdiction of the above-captioned Court for all purposes, including, without limitation, as to any claims, objections, defenses, or counterclaims that could be or have been asserted by the Receiver against such Claimant or the holder of such claim in connection with this Receivership, including, those arising out of (1) any dealing or business transacted by or with any Receivership Entity and/or (2) any dealing or business transacted that relates in any way to any Receivership property.

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. Venue is also proper in this Court because (a) Defendants between January 2016, and the SEC's shut-down of EquiAlt's operations in February 2020, systematically and continuously transacted business with EquiAlt through its headquarters in Tampa, Florida; and (b) Defendants agreed to this venue through the submission of their Proof of Claim in the SEC Action.

## GENERAL ALLEGATIONS

A.     **Background of the EquiAlt Ponzi Scheme and Conspiracy to Fraudulently Sell Unregistered Securities to Unsuspecting Investors in Furtherance of the Ponzi Scheme**

23.     EquiAlt offered and sold EquiAlt Securities to Plaintiffs and other potential investors in California, and other states, using offering documents and sales materials representing that substantially all their invested funds would be used to purchase, rehabilitate and sell for profit single-family properties located in distressed markets throughout the United States and participate in opportunistic lending in the United States, thereby generating generous returns of 8–12% for

the investors. Instead, the EquiAlt Managers perpetrated an illegal Ponzi scheme by which EquiAlt and Defendants used the false and misleading offering documents and marketing materials to lure investors into purchasing the unregistered EquiAlt Securities in violation of federal and state securities laws. Those same investor funds were in turn used in part to pay Defendants more than a million dollars in commissions in exchange for their assistance furthering the fraudulent scheme.

24.     Shortly after EquiAlt was formed in 2011, Davison and Rybicki began to aggressively promote sales of the EquiAlt Securities issued by Fund 1. Davison managed EquiAlt's financing and day-to-day operations, including the acquisition and development of properties owned by the Funds. Rybicki solicited and oversaw the activities of the Sales Agent Defendants and other sales agents, communicated with investors, and raised monies from investors.

25.     Over time, Rybicki recruited approximately 19 individual sales agents and their companies through BR Support Services LLC ("BR Services"). These sales agents operated in concert with EquiAlt and the EquiAlt Managers to solicit investors and a continued influx of money from those investors to EquiAlt and the Funds for use in the EquiAlt Ponzi scheme.

26.     Participating sales agents would submit to BR Services certain documentation and the investors' funds, which BR Services would transmit to EquiAlt. When the investor funds were received, EquiAlt would disburse funds to BR Services equal to a percentage of the invested amounts and BR Services in turn would often pay commissions to the agents equal to 10% or more of the invested amounts. For example, Exhibit 1 to the Receiver's complaint against the Sales Agent Defendants in the Receiver Action shows Defendants over time were paid $1,121,482.65 in commissions for the sale of EquiAlt Securities.

27.     The EquiAlt Managers provided offering documents, including PPMs, Prospective Purchaser Questionnaires, and Subscription Agreements to Defendants for them to give to prospective investors to solicit their investments in the EquiAlt Securities. The material provisions of the PPMs, Prospective Purchaser Questionnaires, and Subscription Agreements are the same for each of Funds. Defendants were given and used identical offering documents to solicit investors for EquiAlt. Defendants provided the PPMs and Subscription Agreements to investors knowing they contained misrepresentations and material omissions. For example, the PPMs and Subscription Agreements for the Funds stated either that no commissions would be paid (Fund 1) or that commissions may be paid and if paid, would only be paid to licensed broker-dealers (Funds 2 through 4); but Defendants knew that they were selling the EquiAlt Securities and receiving transaction based commissions for the sale of the EquiAlt Securities even though they were not licensed broker-dealers. The PPMs for Fund 1, Fund 2, and Fund 4 also indicate that approximately 90% of investor funds would be used to "invest in property." Defendants knew that this was not factually possible because Defendants were paid commissions equaling or exceeding 10% directly from the investors' funds, and those commissions alone, much less any additional operating costs for the Funds, made it mathematically impossible for 90% of investor funds to be used to invest in property. These commission percentages were also much higher than industry averages for the sale of investments and, therefore a red flag for any investment advisor that the investments themselves were questionable. Defendants provided the PPMs and Subscription Agreements to prospective investors without disclosing the foregoing misrepresentations to the prospective investors, thereby hiding that red flag from investors.

28.     Many of the investors to whom EquiAlt and Defendants sold the unregistered securities issued by the Funds were non-accredited, meaning that their net worth was less than $1

million, their individual income was less than $200,000 in each of the two most recent years (or $300,000 in joint income with their spouse), or they failed to meet the other requirements of 17 CFR § 230.501. Defendants knew this with respect to investors they solicited because they processed applications for investments in the EquiAlt Funds, including gathering information on the accredited or non-accredited investor status of potential investors, and so could see directly how many of their investors were non-accredited. Defendants also knew that they were not providing the non-accredited investors with the financial statements required under Regulation D in order to exempt such sales from federal and state securities registration requirements.

29.     Defendants also knew that Funds 1 through 4 were separate in name only. For example, on September 25, 2018, Barry Rybicki sent the following email to certain EquiAlt employees and outside sales agents, including the Defendants stating:

> We are happy to announce that our Fund 1 offering has been filled. We can no longer take investment into Fund 1 as a result of the investment threshold being met. We will however be moving forward with Fund 2 and I have attached the paperwork so please begin to use this paperwork moving forward, I have also attached the banking information just in case you want to use that to make the deposit yourself versus sending the checks in to the office. Just to clarify and answer any potential question, Fund 2 is an identical product to Fund 1 and has been in operation since 2013 so there is zero difference between the activities of both funds.

30.     The PPMs and other offering documents used by EquiAlt and Defendants furthermore contained numerous false and misleading statements and concealed or omitted material information about the use of investors' funds and the risks associated with the Funds. Among other material misrepresentations, the PPMs:

- Falsely stated that "[t]his Offering is being made pursuant to the private offering exemption of Section 4(2) of the [Securities] Act and/or Regulation D promulgated under the Act;"

- Falsely stated that "[t]his Offering is also being made in strict compliance with the applicable state securities laws;"

- Falsely stated that "[t]he Company may utilize the services of one or more

registered broker/dealers" to sell the unregistered securities;

- Falsely overstated the percentage of investor funds that would be used to invest in properties;

- Misleadingly omitted to disclose that commissions would be paid to unregistered broker-dealers in connection with the sale of the unregistered securities; and

- Misleadingly omitted to disclose that millions of dollars would be used to pay undisclosed fees and bonuses to Davison and Rybicki.

31.    EquiAlt, with the Defendants' knowledge and assistance, mischaracterized the them as mere "Consultants" being paid "finders fees" as a subterfuge to facilitate the offer and sale of the EquiAlt Securities by unlicensed dealers. Defendants did not qualify as mere "finders" or "consultants" because, among other things, they received transaction-based compensation, provided financial and suitability advice to prospective investors, actively located and solicited prospective investors, and distributed PPMs and Subscription Agreements to prospective investors.

32.    As a consequence of their actions and knowledge as described above, Defendants knew or recklessly disregarded throughout their involvement with EquiAlt and the Funds, that the Funds were operating in violation of federal and state securities laws.

33.    As a consequence of their actions and knowledge as described above, Defendants knowingly agreed to participate in illegal conduct: soliciting the sale of unregistered EquiAlt Securities in concert with EquiAlt through the use of fraudulent offering documents and in violation of federal and state securities laws for purposes of continuing the EquiAlt Ponzi scheme for the benefit of the EquiAlt Managers and Defendants.

**B.     The EquiAlt Securities Are Non-Exempt Unregistered/Unqualified Securities**

34.     The EquiAlt Securities are securities under the California Securities Law of 1968 ("CSL"), which unless exempt must be qualified before being offered or sold in California unless they are exempt from registration under the Federal Act. Cal. Corp. Code §25102(o).

35.     The EquiAlt Managers, in the PPMs for the EquiAlt Securities, admitted the EquiAlt "debentures" were "securities," but falsely claimed an exemption from registration as a "private offering" under Rule 506(b) of SEC Regulation D.

36.     Rule 506(b) is considered a "safe harbor" under Section 4(a)(2) of the Federal Act. It provides objective standards that a company can rely on to meet the requirements of the Section 4(a)(2) exemption. Companies conducting an offering that qualifies under Rule 506(b) can raise an unlimited amount of money and can sell securities to an unlimited number of accredited investors.

37.     An offering under Rule 506(b) is, however, subject to the following requirements:

- ▪ no general solicitation or advertising to market the securities may be conducted; and
- ▪ all non-accredited investors must be given specific information relating to the offeror's financial condition.

17 C.F.R. § 203.506(b); 17 C.F.R. § 230.502(b). Defendants knew, however, that the EquiAlt Securities were in fact offered and sold in non-compliance with these requirements of Regulation D.

38.     *First*, Defendants knew that investments in the EquiAlt Securities were being solicited through general solicitations and advertisements. Defendants knew that they, EquiAlt, and other EquiAlt sales agents were soliciting investments from the general public through cold-calling campaigns, social media, websites, in-person meetings, and info-dinners.

39.     *Second*, the EquiAlt Managers drafted the subscription materials to be completed by potential investors to confirm the accredited or non-accredited status of the potential investors. Defendants knew that many of the investors had indicated they were non-accredited or unsophisticated in that they lacked knowledge and expertise in financial or business matters, were not capable of evaluating the merits and risks of the investments, and were not otherwise capable of bearing the economic risks of the investments.

40.     *Third*, Defendants knew or recklessly disregarded that EquiAlt had not satisfied the general condition that EquiAlt as the offeror supply all non-accredited investors with the EquiAlt financial reports and information required under Rule 502(b). EquiAlt never completed the required financial reports in connection with any of the Funds prior to EquiAlt being shut down by the SEC. Because no financial statements for EquiAlt or the Funds were ever completed, the Defendants could not and did not provide the required financial reports to non-accredited investors in the Funds.

41.     *Fourth*, Defendants knew that the EquiAlt Securities were being offered and sold in California, Florida, Arizona and elsewhere by unlicensed securities broker-dealers and sales agents who were being paid commissions by EquiAlt to do so. Defendants further knew that investors were expressly told in the PPMs and the Subscription Agreements for the Funds either that no commissions were being paid at all (Fund 1 documents) or that commissions, if paid, were being paid to licensed broker/dealers (Funds 2 through 4)—statements the Defendants knew were false.

**C.     The SEC Finally Shuts Down EquiAlt's Illegal Securities Sales**

42.      By the Spring of 2019, at the latest, the SEC commenced an investigation into the activities of EquiAlt, the EquiAlt Funds, Davison, and Rybicki styled as "In the Matter of Certain Unregistered Securities Transactions." As part of the investigation, the SEC issued subpoenas to

the EquiAlt entities, Davison, and Rybicki, conducted on-site inspections at the EquiAlt offices and, in August of 2019, the SEC issued subpoenas for documents and testimony to various EquiAlt sales agents, including Defendants.

43.    On February 11, 2020, the SEC commenced the SEC Action against EquiAlt, Davison, Rybicki, and others to, among other things, halt the ongoing sale of the EquiAlt Securities, through which EquiAlt had by that time raised over $170 million from Plaintiffs and some 1,100 other investors nationwide, through the efforts of numerous unlicensed sales agents. *See* **Ex. A**.

> **D.    Application of the Discovery Rule, the Fraudulent Concealment Doctrine, Equitable Tolling, and Defendants' Tolling Agreement**

44.    Plaintiffs and the class members had no reason to suspect they had sustained injuries caused by Defendants' wrongful conduct alleged herein until the SEC filed its complaint on February 11, 2020, or later and, despite reasonable investigation, Plaintiffs were unaware until then of a factual basis for the causes of action alleged herein. Plaintiffs and the class members likewise did not and could not reasonably have discovered the alleged misrepresentations and corresponding securities violations and fraud until the SEC filed its complaint, at the earliest.

45.    As alleged above, the EquiAlt marketing brochures, sales solicitation documents, PPMs and subscription agreements all made false representations and failed to disclose material information concerning the safety and liquidity of the EquiAlt Securities, the risks associated with investments in the EquiAlt Securities, EquiAlt's compliance with the securities laws, the experience and qualifications of EquiAlt management and the quality and values of the real estate previously acquired and to be acquired by the EquiAlt Funds.

46.    Defendants and EquiAlt never disclosed or suggested to Plaintiffs and the class members that EquiAlt and the EquiAlt Funds were being operated as part of a massive Ponzi

scheme or that the EquiAlt Managers were diverting millions of dollars in EquiAlt assets in commissions paid to Defendants.

47.     Despite their periodic inquiries and efforts to monitor the status of their investments in the EquiAlt Securities, Plaintiffs and the class members lacked any ability to discover the true financial condition of the EquiAlt Funds or the profligate manner in which commissions were being paid to Defendants. EquiAlt provided no audited or unaudited financial statements to the investors, distributed no written reports describing or summarizing EquiAlt's operations or financial condition, nor did EquiAlt provide any specific information concerning the properties supposedly acquired, appraisals or appraised values of the properties, details concerning the acquisition or sales of the properties supposedly bought and sold by the EquiAlt Funds or any comparable information. To the contrary, all information concerning EquiAlt's operations, financial condition, profits and losses, intra-fund transfers, payments to management and Defendants was and remained in the exclusive possession and control of the EquiAlt Managers and the EquiAlt sales agents.

48.     There was simply no possible avenue for Plaintiffs or the class members to pursue or obtain the information necessary for them to discover the wrongdoing alleged herein until the SEC filed its complaint revealing the Ponzi scheme, at the earliest.

49.     In addition, Plaintiffs and the class members could not reasonably have discovered the wrongdoing earlier due to the active, ongoing fraudulent concealment of the true facts by EquiAlt and Defendants. Indeed, in addition to the fraudulent misrepresentations by EquiAlt management, the Defendants made affirmative false representations to the investors in the PPMs and other documents drafted by the EquiAlt Managers concerning EquiAlt's compliance with the federal and state securities laws. Defendants also solicited purported releases from various

investors, without providing any consideration for those releases, based on fraudulent representations that Defendants would take steps to protect the investors' interests.

50.      Under the fraudulent concealment and equitable tolling doctrines applicable to the claims alleged herein, the limitations periods applicable to the claims asserted in this action were tolled through February 2020, at the earliest.

51.      By agreement dated May 1, 2020, Defendants entered into a tolling agreement extending the time for the assertion of claims against them until March 2023. Defendants signed a Tolling Agreement tolling any otherwise applicable statutes of limitations effective from February 26, 2020, until March 1, 2023, for the benefit of Plaintiffs in *Rubenstein, et al. v. EquiAlt, LLC, et al*., No. 8:20-cv-00448-WFJ-TGW (M.D. Fla.), and all other investors who invested in EquiAlt Securities through Defendants. The Tolling Agreement provides, in pertinent part, as follows:

> Any and all statutes of limitation and repose, and all laches, notice or other time periods applicable to the EquiAlt Claims shall be tolled as against the .... Defendants for the benefit of Plaintiffs and the Plaintiff Class [defined as all persons who invested in EquiAlt Defendants] from the Effective Date [February 26, 2020] through and including the Expiration Date [March 1, 2023].

52.      Accordingly, the limitations periods applicable to the claims asserted in this action were tolled through and including the date of this Complaint.

## PLAINTIFF-SPECIFIC ALLEGATIONS

53.      On August 21, 2017, Plaintiff O'Neal invested $200,000 from Marcia O'Neal's IRA in EquiAlt Fund 1 through the acquisition of a debenture security with an annual interest rate of 12%, with a 36-month term. Then, on January 18, 2018, Marcia O'Neal transferred the $200,000 investment from Fund 1 to Fund 4. In exchange, Marcia O'Neal received Stock Certificate Number 16, with a floor rate of 7% annually with bonus dividend paid in first quarter of the following year and quarterly payments to being in January 2019 and every quarter thereafter.

54.     Plaintiff Siu was solicited and induced by Defendants to make purchases of EquiAlt Securities. Plaintiff Siu invested in three of the EquiAlt Funds between March 20, 2017 and September 20, 2019, for a total of $85,000. In addition, on October 2, 2019, Plaintiff Siu wired $25,000 from the David Siu Rollover IRA Account to invest an additional $25,000 in an EquiAlt Fund.

## CLASS ALLEGATIONS

55.     Plaintiffs brings and assert their claims on behalf of themselves and the following class of similarly situated investors:

> All individuals and/or entities who (a) purchased an EquiAlt Security through Defendants and (b) have suffered a net loss from that investment (the "Class").

56.     Excluded from the Class are Defendants and EquiAlt, their officers, directors and employees, any broker-dealer or sales agent who sold an EquiAlt Security to any member of the Classes, and any member of the Classes who has initiated individual litigation against the Defendants predicated on the same facts alleged herein.

57.     Certification of the Class is appropriate and warranted under Federal Rule of Civil Procedure 23.

58.     The members of the Class are so numerous that separate joinder of each member is impracticable. Defendants sold unregistered EquiAlt Securities to, at minimum, dozens of California investors.

59.     Plaintiffs' contentions raise predominately questions of law or fact common to each member of the Class. These common legal and factual questions include, but are not limited to, the following:

(A)     whether the EquiAlt Securities were exempt from federal and state registration requirements;

(B)    whether Defendants are "statutory sellers" liable for the offer and sale of unregistered securities;

(C)    whether Defendants violated the California Securities Act;

(D)    whether statements made by Defendants to investors in the PPMs misrepresented material facts about the business and operations of EquiAlt and the EquiAlt Funds;

(E)    whether the Plaintiff and other Class members are entitled to recessionary relief, damages, disgorgement, or other forms of relief available under the California Securities Act and/or the Unfair Competition Law; and,

(F)    whether Plaintiffs and Class members are entitled to other equitable relief.

60.    Plaintiffs' claims are typical of the claim of each member of the Class, because, inter alia, Plaintiffs are advancing the same claim and legal theories on behalf of themselves and all members of the Class and Plaintiffs and all Class members were injured through the misconduct alleged herein.

61.    Plaintiffs will fairly and adequately protect and represent the interests of each member of the Class. Plaintiffs are willing and prepared to serve the Court and the Class in a representative capacity with all the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class.

62.    The questions of law or fact common to the claim of each member of the Class predominate over any question of law or fact affecting only individual members of the Class.

63.     Finally, class representation is superior to other available methods for the fair and efficient adjudication of the controversy. In particular,

(A)     there is little economic incentive or other interest of Class members to individually prosecute separate claims,

(B)      it is desirable to concentrate this securities registration litigation in EquiAlt's home forum, where a receiver has been appointed, and

(C)     there appear no difficulties likely to be encountered in the management of the claim or defense on behalf of the Class.

64.     Judicial determination of the common legal and factual issues essential to this case would thus be far more efficient and economical as a class action than in piecemeal individual determinations.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of the California Securities Law of 1968**
**(individually and on behalf of the Class)**

65.     Plaintiffs repeats and re-allege the allegations contained in paragraphs 1–64 above, as if fully set forth herein.

66.     Plaintiffs hereby conditionally tender their EquiAlt Securities in accordance with Cal. Corp. Code § 25503.

67.     California Corp. Code § 25110 prohibits the offer or sale by any person in California of securities that are not qualified through registration. California Corp. Code § 25503 affords a statutory cause of action to victimized investors for violations of Section 25110.

68.     California Corp. Code § 25504 extends liability under Section 25503 to any person who "directly or indirectly controls" a person liable under Section 25503, "every partner in a firm

so liable, every principal executive officer or director of a corporation so liable," and "every person occupying a similar status or performing similar functions."

69.     Defendants and EquiAlt offered and sold the EquiAlt Securities in and from California without the EquiAlt Securities being properly registered or qualified for offer or sale either with any federal or California regulator.

70.     California Corp. Code § 25210(b) provides:

No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents.

71.     California Corp. Code § 25501.5 affords a statutory cause of action to victimized investors for violations of Section 25210(b).

72.     Defendants breached Section 25210(b) by offering and selling the EquiAlt Securities despite the fact that (a) such securities were not qualified under the CSL and (b) such broker-dealers and agents were not licensed under the CSL.

73.     California Corp. Code § 25401 prohibits fraud in the offer or sale by any person in California of securities. California Corp. Code § 25501 affords a statutory cause of action to victimized investors for violations of Section 25401. California Corp. Code § 25504 extends liability under Section 25501 to any person who "directly or indirectly controls" a person liable under Section 25501, "every partner in a firm so liable, every principal executive officer or director of a corporation so liable," and "every person occupying a similar status or performing similar functions."

74.     Defendants offered and sold the EquiAlt Securities in and from California by means of written or oral communications that include untrue statements of a material fact and omit

material facts necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

75.     Defendants materially assisted in EquiAlt's violations of the CSL with the intent to deceive or defraud potential investors.

76.     California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25110 with the intent to deceive or defraud and makes them jointly and severally liable with any other person liable under Section 25503.

77.     California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25401 with the intent to deceive or defraud and makes them jointly and severally liable with any other person liable under Section 25503.

78.     Finally, California Corp. Code § 25403 makes every person who "with knowledge directly or indirectly controls and induces any person to violate any provision" of the CSL or who "knowingly provides substantial assistance to another person in violation of any provision" of the CSL directly liable for violation of the same provision of the CSL. Cal. Corp. Code § 25403(a) and (b).

79.     Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under Cal. Corp. Code. § 25503, § 25403, § 25504, § 25504.1, and § 25501.5.

**COUNT II**
**Fraud and Deceit**
**(individually and on behalf of the Class)**

80.     Plaintiffs repeat and re-allege the allegations contained paragraphs 1–64 above, as if fully set forth herein.

81.     Defendants made uniform false representations and concealed or failed to disclose material facts concerning the Funds' compliance with the federal and state securities laws, the

safety and risks of the EquiAlt Securities and the financial performance and solvency of EquiAlt and the Funds, all with the intent to deceive prospective investors.

82.     The PPMs used by Defendants to induce sales of the EquiAlt Securities made the following materially false misrepresentations and omissions, among others:

      a.  Falsely stated that "[t]his Offering is being made pursuant to the private offering exemption of Section 4(2) of the [Securities] Act and/or Regulation D promulgated under the Act;"

      b.  Falsely stated that "[t]his Offering is also being made in strict compliance with the applicable state securities laws;"

      c.  Falsely stated that "[t]he Company may utilize the services of one or more registered broker/dealers" to sell the unregistered EquiAlt Securities;

      d.  Falsely overstated the percentage of investor funds that would be used to invest in properties; and

      e.  Misleadingly omitted that commissions would be paid to unregistered broker-dealers in connection with the sale of the unregistered securities.

83.     Plaintiffs and the members of the Class reasonably and justifiably relied on the foregoing false representations and material omissions, were unaware of the falsity of the representations or the material omissions and would not have invested in the EquiAlt Securities had they known the true facts. As a consequence, Plaintiffs and the members of the Class sustained damages.

84.     Defendants had actual knowledge of some or all of the false statements and material omissions used to solicit investment in the EquiAlt Securities, and their conduct was a substantial factor in causing harm to Plaintiffs and the members of the Class.

85.     Defendants acted with the specific intent to facilitate the foregoing wrongful conduct.

86.     The foregoing actions by Defendants were done maliciously, oppressively, and with intent to defraud, thereby entitling Plaintiffs and members of the Class to punitive and exemplary damages.

**COUNT III**
**Violation of Unfair Competition Law Business & Professions Code § 17200, et seq.**
**(individually and on behalf of the Class)**

87.     Plaintiffs repeat and re-allege the allegations contained paragraphs 1–64 above, as if fully set forth herein.

88.     California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq*. (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Profession Code §17500.

89.     Defendants have committed business acts and practices that violate the UCL by engaging in fraudulent and unfair conduct and unlawful conduct. Defendants' conduct as alleged above constitutes unlawful competition in that, for the reasons set forth above, said acts and practices violate various provisions of the California Corporations Code.

90.     Defendants' conduct as alleged above also constitutes unfair competition in that, for the reasons set forth above, the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

91.     Defendants' conduct was a proximate cause of the injuries to Plaintiffs and the Class alleged herein, and it caused and continues to cause substantial injury to Plaintiffs and the members of the Class. By reason of the foregoing, Defendants should be required to pay restitution to Plaintiffs and members of the Class.

**PRAYER**

Based on the foregoing, Plaintiffs request the Court enter a judgment:

      A.      certifying the Class;

      B.      awarding such declaratory, injunctive and other equitable relief as warranted under the claims asserted together with pre-judgment interest;

      C.      awarding compensatory damages and punitive damages to Plaintiffs and the Class, in an amount to be determined at trial, together with pre-judgment interest;

      D.      declaring that any releases solicited by Defendants from members of the Class are void and unenforceable;

      E.      awarding Plaintiffs and the Class the costs of this action, including reasonable attorneys' fees and expenses; and

      F.      awarding such further relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims so triable.

RESPECTFULLY SUBMITTED this 21st day of April, 2022.

            **THE MOSKOWITZ LAW FIRM, PLLC**

            *s/ Adam M. Moskowitz*
            ADAM M. MOSKOWITZ
            Fla. Bar No. 984280
            Adam@moskowitz-law.com
            Howard M. Bushman
            Fla. Bar No. 0364230
            Howard@moskowitz-law.com
            Adam A. Schwartzbaum
            Fla. Bar No. 93014
            Adams@moskowitz-law.com

2 Alhambra Plaza, Suite 601
Coral Gables, Florida 33134
Telephone: (305) 740-1423
Facsimile: (786) 298-5737


**BONNETT FAIRBOURN**
**FRIEDMAN & BALINT, PC**
Andrew S. Friedman
afriedman@BFFB.com
(to be admitted *pro hac vice*)
Francis J. Balint, Jr.
fbalint@BFFB.com
(to be admitted pro hac vice)
2325 E. Camelback Rd., Suite 300
Phoenix, AZ 85016
Telephone: (602) 274-1100
Facsimile: (602) 274-1199


**SONN LAW GROUP PA**
Jeffrey Sonn
Fla. Bar. No. 773514
jsonn@sonnlaw.com
One Turnberry Place
19495 Biscayne Blvd. Suite 607
Aventura, FL 33180
Telephone: (305) 912-3000
Facsimile: (786) 485-1501


**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT &**
**PENFIELD, LLP**
Gayle M. Blatt
gmb@cglaw.com
(to be admitted *pro hac vice*)
110 Laurel Street
San Diego, California 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232


*Attorneys for Plaintiffs*